## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

|  |  |  |
|---|---|---|
| BIOURJA RENEWABLES, LLC, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | Case No. 1:23-cv-01280-MMM-RLH |
| | ) | |
| GOJO INDUSTRIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER AND OPINION

This case concerns a contractual dispute between Plaintiff BioUrja Renewables, LLC ("BioUrja"), and Defendant GOJO Industries, Inc ("GOJO"). Now before the Court is GOJO's Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56.[1] D. 53. For the reasons below, GOJO's [53] Motion is DENIED.

## I.    FACTUAL BACKGROUND

The following facts are undisputed. GOJO manufactures Purell ® hand sanitizer, which requires high-grade ethanol ("the Product") to do so. At the height of the COVID-19 pandemic, GOJO entered into its largest ever ethanol supply contract – both in volume and cost – in order to meet its unprecedented consumer demand.[2] This agreement, summarized below, is now the subject of the current dispute.

On June 9, 2020, GOJO entered a Sale Confirmation #14324 ("the Contract") with Vantage Corn Processors, a unit of Archer-Daniels-Midland Company (collectively, "ADM"). The original

---

[1] Also pending is BioUrja's Motion for Partial Summary Judgment on GOJO's affirmative defenses. D. 54. The Court will address this Motion in a later Order.
[2] Though the parties agree that the Contract was critical to meet consumer demand, they dispute whether and to what extend GOJO knew its Product needs for the 2021 calendar year at the time of the Contract.

Contract provided that ADM "agrees to sell to [GOJO], and [GOJO] agrees to buy from [ADM], the Products (as defined below) on the terms and conditions set forth herein." D. 8-1 at 1. The Contract then provided the following provisions:

| Product: | SDA 3C 190 Proof (ADM Product Code 017643) |
| --- | --- |

*       *       *

| Volume: | 14,740,566 gallons (100,000,000 lbs) |
| --- | --- |
| Term: | January 1, 2021 – December 31, 2021 |
| Price: | $3.67/gal rail delivered ($0.54/lb) |

*       *       *

| Other: | If Gojo has a formula change that would require 40B 190 Proof (ADM Product Code 017653), buyer has the option to use this contract volume. Pricing for SDA 40B 190 proof is $3.57/gal ($0.525/lb) rail delivered Barberton.<br><br>Buyer has the option to extend this contract volume through February 28, 2022. After the grace period, 1% of price will be added to the contract each month until the contract is consumed. |
| --- | --- |

*Id.*

When negotiating the Contract, GOJO asked ADM to include a provision that would allow GOJO to continue performing the Contract beyond the 2021 calendar year. In response, ADM provided an option under the "Other" provision, that provides a sixty-day grace period allowing GOJO until February 28, 2022, to consume 100,000,000 pounds ("the Contract Volume") of the Product. The "Other" provision also included what the parties refer to as a "price escalator." Under the price escalator, the price of the Product would increase by one percent each month after the grace period until GOJO had consumed the Contract Volume.

The Contract further provided ADM with certain remedies in the case of breach. In the event of GOJO's breach, ADM could, "at its option: (v) cancel all contracts with [GOJO], (w) suspend performance, (x) withhold any payment owed to [GOJO], (y) offset and deduct any amount owed by [ADM] by any amount owed by [GOJO], and/or (z) pursue any other available

2

remedy." D. 8-5 at 4. The parties also agreed that any waiver under the Contract "shall be ineffective unless it is in writing and signed by the party granting it." *Id*.

On February 1, 2021, ADM contacted GOJO regarding the Contract's Term. The parties ultimately adjusted the Term provision so that the Contract began on March 1, 2021, instead of January 1, 2021, and concluded on February 28, 2022. ADM also added a note that it "Amended term to reflect estimated shipment." D. 8-2 at 1. Thus, as of February 2, 2021, the Contract[3] provided:

| | |
|---|---|
| **Volume:** | 14,740,566 gallons (100,000,000 lbs) |
| **Term:** | ~~January 1, 2021 – December 31, 2021~~  March 1, 2021 – February 28, 2022 (AM 2/2/21) |
| **Price:** | $3.67/gal rail delivered ($0.54/lb) |

*     *     *

| | |
|---|---|
| **Other:** | If Gojo has a formula change that would require 40B 190 Proof (ADM Product Code 017653), buyer has the option to use this contract volume.  Pricing for SDA 40B 190 proof is $3.57/gal ($0.525/lb) rail delivered Barberton.<br><br>Buyer has the option to extend this contract volume through February 28, 2022. After the grace period, 1% of price will be added to the contract each month until the contract is consumed.<br><br>2/2/21 – Amended term to reflect estimated shipment |

*Id*.

ADM and GOJO negotiated both the Contract's initial and amended terms. BioUrja was neither involved in the Contract's formation, nor did it have any knowledge of either party's intent during the negotiation process. On November 1, 2021, BioUrja acquired ADM and assumed ADM's position in the Contract.

On February 28, 2022, GOJO did not purchase 100 million pounds of Product as stated under the Contract. Though the parties dispute exactly how much Product GOJO consumed, they agree that GOJO consumed no more than 15,000,000 pounds of Product, leaving at least eighty-

---

[3] From this point forward, "the Contract" will refer to the agreement as amended on February 2, 2021.

five percent of the Contract Volume unconsumed.[4] GOJO's last purchase order under the Contract was in December 2021. On March 21, 2022, BioUrja emailed GOJO stating "Per the language in the [C]ontract, I need to start the carry calculation this month. Do you want me to send you an amended contract each month with this calculation?" D. 53 at 16.[5] Despite not having consumed the Contract Volume, GOJO did not place any further purchase orders under the Contract. On October 13, 2022, BioUrja terminated the Contract and demanded $6,491,000 in payment.

## II.    LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

The party moving for summary judgment bears the burden of showing that there is "no genuine issue as to any material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In meeting this burden, the movant must direct the court to portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which establish "the absence of a genuine issue of material fact." *Id*. When a motion for summary judgment is properly supported, the burden then shifts to the adverse party who "must set forth

---

[4] BioUrja claims that, at the time of termination, GOJO had only purchased 10,525,240 pounds of Product. D. 56 at 26. GOJO disputes this number and claiming it had purchased approximately 15,000,000 pounds of Product. *See* D. 64 at 12.
[5] BioUrja argues that this email does not indicate that the parties were applying the price escalator provision because GOJO never placed another purchase order under the Contract. D. 56 at 17.

specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. Neither general allegations nor "[t]he mere existence of a scintilla of evidence in support of the [nonmovant]'s position" will satisfy this burden. *Id*.

In evaluating a motion for summary judgment, a court must construe all facts in the light most favorable to the non-moving party, and all reasonable inferences must be drawn in their favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). However, courts will not go as far as drawing inferences that are "supported by only speculation or conjecture" as "[c]onclusory allegations alone cannot defeat a motion for summary judgment." *Nicklin v. Costco Wholesale Corp.*, No. 24-CV-1133, 2025 WL 2245122 at *1 (C.D. Ill. Aug. 6, 2025) (internal quotations omitted). Thus, a showing of a genuine material facts must include "specific allegations supported by appropriate citations to relevant admissible evidence[.]" *Id*. A court need not "scour the record" for relevant evidence, *see Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017), and only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3).

### III.    DISCUSSION

A federal court exercising diversity jurisdiction, such as in this case, must apply the choice-of-law rules of the forum state. *E. Coast Ent. of Durham, LLC v. Houston Cas. Co.*, 31 F.4th 547, 550 (7th Cir. 2022). The parties agree that relevant choice-of-law provision points to Illinois, and that Illinois law governs. D. 8-1 at 9; *see also* D. 53 at 2 (applying Illinois contract law); D. 56 at 30 (same). Thus, the Court will apply Illinois law. *See Thomas v. Guardsmark, Inc.*, 381 F.3d 701, 704–05 (7th Cir. 2004) (writing that "[i]n a diversity case, the federal court must apply the choice of law rules of the forum state to determine applicable substantive law…as long as the contract is valid and the law chosen is not contrary to Illinois's fundamental public policy").

In Illinois, as elsewhere, a plaintiff bringing a breach-of-contract claim must prove "(1) the existence of a valid and enforceable contract, (2) substantial performance by the plaintiff, (3) breach by the defendant, and (4) damages caused by that breach." *Ivey v. Transunion Rental Screening Sols., Inc.*, 2022 IL 127903, ¶ 28, reh'g denied (Jan. 23, 2023); *see also Hernandez v. Illinois Inst. of Tech.*, 63 F.4th 661, 667 (7th Cir. 2023). GOJO's Motion only challenges the third element, arguing that it did not breach the Contract. In support, GOJO makes three arguments: (1) that the Contract's language unambiguously provided an indefinite amount of time for GOJO to purchase the Contract Volume; (2) even if the language is ambiguous, the extrinsic evidence favors GOJO's interpretation; and (3) if the Court finds that GOJO did have to perform prior to BioUrja's termination, BioUrja waived its right to enforce that deadline. The Court will address each argument in turn.

## A.    The Contract's end date is ambiguous.

GOJO and BioUrja agree that the Contract is unambiguous but, unsurprisingly, disagree on its meaning. GOJO argues that the Contract is unambiguously open-ended, providing it an infinite time to perform so long as it paid the increased price under the price escalator. BioUrja, on the other hand, contends that the Contract's Term provision clearly provides the operative end date: February 28, 2022.

### 1. *Legal Standard:*

A court's primary goal when construing a contract is to give effect to the parties' intent. *Gallagher v. Lenart*, 226 Ill. 2d 208, 232, 874 N.E.2d 43 (2007). To do so, courts initially look solely at the language of the contract. *See id*. at 233 (noting that "the language, given its plain and ordinary meaning, is the best indication of the parties' intent."). When interpreting the contract, courts must look at the agreement in its entirety, "viewing each provision in light of the other provisions." *Thompson v. Gordon*, 241 Ill. 2d 428, 441, 948 N.E.2d 39, 47 (2011). If the contract's

language unambiguously resolves the dispute, the court should apply the contract language giving effect to its ordinary and natural meaning. *William Blair & Co., LLC v. FI Liquidation Corp.*, 358 Ill. App. 3d 324, 335, 830 N.E.2d 760 (2005); *Emergency Med. Care, Inc. v. Marion Mem'l Hosp.*, 94 F.3d 1059, 1061 (7th Cir. 1996). If the language is ambiguous, the Court may look to extrinsic evidence to determine the parties' intent. *Gallagher*, 226 Ill. 2d at 233, 874 N.E.2d at 58.

Thus, a contract's ambiguity is a threshold issue. Whether a contract is ambiguous is a matter of law. *William Blair & Co.*, 358 Ill. App. 3d at 334, 830 N.E.2d at 769. Generally, ambiguity exists when the contract's "language is reasonably and fairly susceptible to more than one meaning." *Emergency Med. Care,* 94 F.3d at 1061 (citing *CSX Transp. v. Chicago and North Western Transp.,* 62 F.3d 185, 189 (7th Cir.1995)). However, a proposed interpretation that is unreasonable or leads to an absurd result does not warrant an ambiguity finding. *See Foxfield Realty, Inc. v. Kubula*, 287 Ill. App. 3d 519, 524, 678 N.E.2d 1060 (1997) ("Courts will construe a contract reasonably to avoid absurd results."). Further, a disagreement among parties as to the meaning of the contract does not automatically render its language ambiguous. *Thompson*, 241 Ill. 2d at 441, 948 N.E.2d at 47. Rather, a contract is unambiguous where "the court can determine its meaning without any guide other than knowledge of simple facts on which, from the nature of language in general, its meaning depends." *See Foxfield Realty, Inc.*, 287 Ill. App. 3d at 524, 678 N.E.2d at 1063.

   2.  *Discussion:*

Here, the language of the Contract is unambiguous in many respects. The Contract unambiguously required GOJO to purchase 100 million pounds of Product from ADM and, later, BioUrja. Further, GOJO was to pay approximately $0.54 cents per pound of Product purchased during the Contract's Term (March 1, 2021 – February 28, 2022). None of this is disputed. What

is disputed is GOJO's deadline for performance. Thus, the Court must evaluate whether the Contract's language unambiguously provides a time by which GOJO had to perform.

BioUrja contends that the Contract unambiguously imposes a deadline of February 28, 2022, citing the Contract's Term provision. *See* D. 8-5 at 11 (defining the "Term" as "March 1, 2021 – February 28, 2022"). But this interpretation is directly contradicted by the Contract's "Other" provision which provides that, after February 28, 2022, "1% of price will be added to the contract each month until the contract is consumed." *Id*. The Court cannot read the "Term" provision in isolation, as it would render the price escalator in the "Other" provision meaningless. *See Thompson*, 241 Ill. 2d at 441, 948 N.E.2d at 47 (stating courts cannot determine the parties' intent "by viewing a clause or provision in isolation, or in looking at detached portions of the contract.").

BioUrja argues that the Court must enforce February 28, 2022, as a hard deadline or else render the Term provision meaningless. Not so. The Term provision and the price escalator can simultaneously exist. A reasonable interpretation, in fact the only interpretation, is that the Term provision provided the window of time in which the Product's price would be fixed at $0.54 per pound. Then, on March 1, 2002, the original unit price would increase by one percent each month until the Contract is consumed. Thus, the Contract language is unambiguously clear that GOJO could continue to purchase Product after the February 28, 2022, albeit at a continuously increasing price.

Though the Contract allows GOJO to continue to purchase Product after February 28, 2022, it does not state a new deadline under the price escalator. GOJO takes this to mean it could perform at its leisure or, as BioUrja highlights, not at all. GOJO argues that, though there was a stated Term for pricing purposes, the "Other" provision and price escalator unambiguously create an open-

ended agreement. However, there is no language within the "Other" provision or elsewhere in the Contract that states GOJO had an indefinite time to perform. The "Other" provision only states that, after the Contract's Term, the price escalator applies "until the [C]ontract is consumed." D. 8-2 at 1. Though this provision makes clear when the Product's price begins to increase, it leaves the question of GOJO's ultimate performance deadline unresolved. Any attempt to define the deadline based on this language would result in circular reasoning: that GOJO's performance is due when "the [C]ontract is consumed" which, in turn, could only occur by completion of such performance. *See id*.

Further, GOJO's interpretation cannot be reconciled with the Contract's express language as it would render GOJO's agreement to purchase the Contract Volume meaningless.[6] In other words, the Court cannot simultaneously find that the Contract obligated GOJO to consume 100 million pounds of Product while also finding that the Contract imposed no deadline for it to do so. *See Thompson*, 241 Ill. 2d at 441, 948 N.E.2d at 47 ("A court will not interpret a contract in a manner that would nullify or render provisions meaningless[.]"). GOJO's interpretation would be reasonable if the Court were to interpret this agreement as an option contract, in which the buyer has the option to purchase the goods in accordance with the contract's terms, but is not obligated to do so. *See Brooklyn Bagel Boys, Inc. v. Earthgrains Refrigerated Dough Prods., Inc.*, 212 F.3d 373, 379 (7th Cir. 2000). However, as previously noted, the Contract unambiguously requires

---

[6] For this reason, the Court struggles to find that an open-ended agreement would be commercially reasonable. Under its interpretation, GOJO seemingly could sit on its hands while BioUrja would be forced to "wait at its customer's mercy for years following the stated term for its customer to unilaterally decide whether or not it wishes to perform after the term and, if it does not, never pull any product without facing any consequences for the breach." D. 56 at 33; *see also XCO Int'l Inc. v. Pac. Sci. Co.*, 369 F.3d 998, 1005 (7th Cir. 2004) ("Contract interpretations that produce commercially unreasonable results are disfavored, not as a matter of public policy but simply because they are implausible to impute to parties."). GOJO relies on the price escalator in an attempt to rationalize its interpretation, arguing that it mitigated any harm BioUrja may incur from any delay in performance. But the price escalator only benefits BioUrja if GOJO purchases the Product after February 2022, and, under GOJO's interpretation, there was no deadline for it to do so. Thus, any business advantage BioUrja stood to gain from the price escalator was subject to GOJO's discretion.

GOJO to purchase the Contract Volume. *See* D. 8-2 at 1; *see also* D. 16 at 6 (denying GOJO's argument that that Contract was an option contract). To give that obligation any meaning, the Court must find that GOJO had a duty to complete that performance by a certain time. *See Malnove Inc. of Nebraska v. Hearthside Baking Co.*, 944 F. Supp. 657 (N.D. Ill. 1996) (imposing a deadline for performance where the contract's language did not); *Driveline Sys., LLC v. Arctic Cat, Inc.*, 936 F.3d 576 (7th Cir. 2019) (finding that though the parties did not agree on a time for performance, buyer had a reasonable, but not infinite, amount of time to perform).[7]

For the above reasons, the Contract's failure to specify GOJO's deadline for performance constitutes an omitted term that cannot be remedied by the Contract's language. *See* RESTATEMENT (SECOND) OF CONTRACTS § 204 (c) (1981) ("Interpretation may be necessary to determine that the parties have not agreed with respect to a particular term, but the supplying of an omitted term is not within the definition of interpretation[.]"). Thus, the Contract unambiguously allowed GOJO to perform after the conclusion of the Term but does not state when its performance was ultimately due.[8] Finding the Contract ambiguous in this regard, the Court next turns to the extrinsic evidence to determine the parties' intent.

## B. The extrinsic evidence does not resolve the parties' intended deadline as a matter of law.

As discussed, the Contract fails to state a deadline for GOJO's performance. The Court now must wade through the extrinsic evidence in attempt to remedy the parties' omission. This undertaking, as well as this lawsuit, could have been avoided had the parties simply provided a

---

[7] At oral argument, GOJO seemed to concede that even under its interpretation, GOJO could be found in breach of contract if it did not perform within a reasonable amount of time as defined in Illinois's UCC. See 810 Ill. Comp. Stat. 5/2-309.

[8] This is consistent with U.S. District Judge Joe B. McDade's previous Order denying BioUrja's Motion to Dismiss the breach of contract claim where it found the contract's language ambiguous noting "the terms of the Contract are capable of being understood by Plaintiff and Defendant 'in more senses than one[.]" D. 16 at 11 (citing *Vibrant Credit Union v. Infinity Federal Credit Union*, No. 421CV04049SLDJEH, 2022 WL 626764, at *3 (C.D. Ill. Mar. 3, 2022).

date within the "Other" provision. Both parties here are sophisticated, experienced commercial actors. The Court cannot fathom how such entities failed to include a term as essential as a performance deadline, particularly in the case of a multi-million-dollar contract.

However, the Illinois' Uniform Commercial Code ("UCC") "mindful of the haste, sloppiness, and disregard for lawyerly niceties that characterize commercial dealing, tolerates a good deal of incompleteness[.]" *Architectural Metal Systems, Inc. v. Consolidated Systems, Inc.* 58 F.3d 1227, 26 U.C.C. Rep. Serv. 2d 1047 (7th Cir. 1995). When faced with a contract for goods that contains a missing essential term, the UCC proscribes the following approach: first, the Court looks to extrinsic evidence to determine whether the parties impliedly agreed upon a term. *See Fountain v. Lohan*, No. 04 C 6778, 2005 WL 8178951, at *3 (N.D. Ill. Oct. 11, 2005). Second, if there is no implied agreement from the extrinsic evidence, the court can supply the term by referring to statutory "gap filler" provisions of Article 2. *Id*.; *see also* 810 Ill. Comp. Stat. 5/2-309. The Court begins by examining the extrinsic evidence to determine whether the parties agreed on a deadline for GOJO to perform.

### 1. Legal Standard:

Where the language of the contract is ambiguous or, contains a "yawning void" that "cries out for an implied term"" courts look to extrinsic evidence in an attempt to determine the parties' intent. *Tech. Sec. Integration, Inc. v. EPI Techs., Inc.*, 126 F.4th 557, 560 (7th Cir. 2025) (quoting *Brooklyn Bagel Boys*, 212 F.3d at 380).[9] Where the contract involves goods, as it does here, UCC

---

[9] The parol evidence rule also permits a court to use extrinsic evidence where the contract is not integrated. *Brooklyn Bagel Boys, Inc.*, 212 F.3d at 380. On the other hand, the rule generally bars extrinsic evidence where "the contract imports on its face to be a complete expression of the whole agreement [because] it is presumed that the parties introduced into it every material item, and parol evidence cannot be admitted to add another term to the agreement[.]" *See id*. (quoting *Sunstream Jet Exp., Inc. v. International Air Serv. Co., Ltd.,* 734 F.2d 1258, 1265 (7th Cir.1984)). Here, because the Court finds the Contract ambiguous it may proceed to evaluate the extrinsic and parol evidence without reaching the integration issue. *See GFRB, LLC v. Worthy Promotional Prods., LLC*, 624 F. Supp. 3d 959, 966 (N.D. Ill. 2022) (noting that extrinsic and parol evidence is admissible to explain the terms of an ambiguous contract, even when that contract is integrated).

allows courts to consider extrinsic evidence to explain ambiguities. *See Fountain*, 2005 WL 8178951, at *3. Generally, summary judgment is inappropriate where the contract language is ambiguous, and the parties' intent must be resolved on extrinsic evidence. *William Blair & Co.*, 358 Ill. App. 3d at 335, 830 N.E.2d at 770. "This is true even if there are no credibility issues, that is, even if each piece of evidence is accepted as authentic and true, and the only issue is the proper inference from the evidence considered as a whole." *In re Mod. Dairy of Champaign, Inc.*, 171 F.3d 1106, 1109 (7th Cir. 1999). Thus, summary judgment is limited to the narrow set of cases in which the extrinsic evidence is both undisputed and warrants only one reasonable inference in favor of dismissal. *Id.*; *see also Loyola Acad. v. S & S Roof Maint., Inc.*, 146 Ill. 2d 263, 272, 586 N.E.2d 1211, 1215 (1992) ("[W]here reasonable persons could draw divergent inferences from the undisputed facts, the issue should be decided by the trier of fact and the [summary judgment] motions should be denied.").

     *2. Discussion:*

GOJO argues that the extrinsic evidence undisputably shows that there was no deadline by which it had to consume the Contract Volume. GOJO notes that BioUrja did not immediately hold it in breach when it failed to consume all one million pounds of Product by the end of February 2022. Instead BioUrja informed GOJO that it would apply the price escalator under the "Other" provision and provided an updated contract. But this only establishes that GOJO did not have to purchase all one million pounds of Product under the Contract by February 28, 2022.[10] As discussed above, an omitted end-date alone does not warrant the inference that the agreement was open-ended. Given the Contract's lack of deadline, BioUrja's witnesses' inability to specify the

---

[10] BioUrja also provides extrinsic evidence to support its theory that February 28, 2022, was the date of performance. However, because the Contract unambiguously states otherwise, the Court will not discuss the evidence regarding this point.

exact date of breach is not surprising, and certainly not dispositive at this stage.[11] Their difficulty in identifying the time of breach cannot conclusively establish that GOJO could perform whenever it pleased. At minimum, a reasonable juror could find this uncertainty only reflects that neither the Contract nor the subsequent communications established a firm deadline.

GOJO also argues that, even if none of the extrinsic evidence explicitly provides a deadline, it does establish that GOJO had at least until the end of 2022 to purchase the remaining Product under the Contract. Therefore, because BioUrja terminated the Contract in October 2022, any breach of contract claim would be premature as GOJO was still capable of performing.

Relevant to this theory are the parties' negotiations leading up to the Contract. Prior to the Contract, GOJO requested that BioUrja's predecessor, ADM, provide it the full 2022 calendar year to purchase the Contract Volume at the Contract's specified price. *See* D. 56 at 34–35. However, ADM refused. Instead of allowing GOJO to continue to purchase the Contract Volume for the entire 2022 year, ADM told GOJO it "had some different ideas." *See* D. 53-2 at 17–18. ADM proposed, and the parties ultimately agreed, to a two-month extension – *i.e.* the February 28, 2022, deadline – after which the price escalator would apply. This compromise is memorialized in the Contract's "Other" provision.

This exchange is not in dispute; however, it is subject to various plausible interpretations. On the one hand, because the "Other" provision was proposed in response to GOJO's request for the full 2022 calendar year, one could infer that the price escalator afforded *at least* until the conclusion of 2022. Alternatively, a reasonable juror could determine that BioUrja's proposal was

---

[11] For example, GOJO cites to the deposition of BioUrja's 30(b)(6) witness, Mr. Jordan Fife. In sum, Mr. Fife testified that GOJO was in breach of the contract "when [the termination letter] hits their inbox." D. 50 at 26. According to GOJO, this supports the proposition that BioUrja did not believe GOJO was in breach prior to the termination letter, sent on October 12, 2022. Similarly, GOJO references the testimony of BioUrja's damages expert, Dr. Scott Irwin, to demonstrate the inconclusive deadline. Specifically, Dr. Irwin testified that he had not used February 28, 2022, as a "key date" in his damages' calculation. D. 50 at 26.

a "different idea[]" in that it did not function to extend the Contract through the 2022 calendar year as requested.

GOJO's internal communications support the latter interpretation. On June 16, 2020, GOJO's legal department also indicated its preference that the Contract extend into the "full 2022 calendar year as the volume commitment seems high for a single Supplier[.]" D. 56-4 at 2. However, despite its concerns that GOJO could not consume the Contract Volume without this extension, the legal department stated that it trusted the sales team's decision to "commit to this." *Id*. A reasonable juror could infer that this commitment referred to GOJO's duty to purchase the Contract Volume prior to the end of 2022.

Alternatively, GOJO cites the parties' other communications in further support of performance date after the 2022 calendar year. For example, on September 14, 2021, ADM sent GOJO an email with the subject line "forecast." D. 53-3 at 57. ADM begins the email stating "I know the answer but wanted to check" then continues on to ask whether GOJO predicted the Contract "going through Q1 2023 at this point or *still* end by Dec. 2022?" *Id*. GOJO responded that it estimated the Contract would continue until the start of 2023. *Id*. On November 8, 2021, in an internal communication, BioUrja further notes the great distinction between "the actual timeframe the contract was covered for vs. when we think [its customers] will pull it." *See* 53-3 at 62. BioUrja goes on to state that the Contract was a "good example" of this variance, noting that the Contract was initially for 2021 calendar year "however will likely last into 2023 potentially." *Id*.

A reasonable jury could take this communication to mean that GOJO could continue to perform through the 2022 calendar year. However, this finding alone does not warrant summary judgment. As discussed, the Court may only grant summary judgment where there is only one

14

reasonable inference to be made from the record. *See In re Mod.*, 171 F.3d at 1109. BioUrja argues that these communications support an alternative conclusion.[12] It contends these emails only reflect informal predictions and that GOJO was unable to provide any forecast as to when it would be able to perform. *See* D. 56 at 11 (quoting D. 56–10, 219:1–5 (testifying that GOJO did not provide any definite indication of when exactly it was going to pull Product under the Contract)). Thus, GOJO's forecast, to which ADM did not respond, does not support the sole inference that the parties agreed GOJO could perform through the 2022 calendar year.[13] Further, BioUrja classified GOJO as a "[b]ig wildcard" and stated that it could not estimate when it expected to fulfill the Contract. D. 53 at 13. Though BioUrja assumed "that [the Contract] will last through 2022," it also noted GOJO could not provide any forecast. *Id*. Biourja also stated that "[t]he timeframes do not mean much right nnow (*sic*) given our customers cannot tell us what/when they will pull – those are best projections on when the volume would be pulled[.]" D. 53-3 at 62. Thus, the extrinsic evidence also supports an inference that BioUrja did not intend to treat GOJO's projections as extending its time to perform under the Contract.

Further, BioUrja points to the parties' prior course of dealings to support the inference that GOJO's performance was past due at the time of the termination. The UCC defines "course of dealing" as "a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." 810 ILCS 5/1-303(b). Whether a course of

---

[12] BioUrja cites to extrinsic evidence to support its contention that the Term provision of the Contract imposed a firm deadline of February 28, 2022. As discussed, the Court previously found that the Contract's "Other" provision unambiguously allowed GOJO to continue to perform after the stated Term. Thus, it will not evaluate any evidence that the language of the contract unambiguously resolves.

[13] GOJO later argues that ADM's failure to protest to these projections amounts to waiver of any deadline prior to 2023. However, as discussed, the Contract required all waivers to be in writing and signed by the waiving party.

dealing exists between parties to a transaction is a question of fact. *Capitol Converting Equip., Inc. v. LEP Transp., Inc.*, 965 F.2d 391, 395 (7th Cir. 1992).

ADM and GOJO had a previous ethanol supply contract for the 2020 calendar year ("2020 Contract"). Like here, GOJO had not consumed the entire volume of product under the 2020 Contract by the end of the stated term. ADM permitted GOJO to perform but did not provide a firm deadline under this impromptu extension. Despite the omitted date of performance, GOJO fulfilled the 2020 Contract in February 2021, a few months after the 2020 Contract's term provision. BioUrja cites this prior dealing to argue that GOJO was in breach under the Contract given that more than a few months had passed prior to the termination.

GOJO argues that the 2020 Contract does not have any bearing on the present agreement. GOJO notes that the 2020 Contract did not contain an "Other" provision such as the one here. Though GOJO's challenge may be persuasive with the jury, it is not one the Court is permitted to resolve at this stage.[14] Because a fact finder may reasonably infer that the 2020 Contract informs the parties' intention regarding future omitted deadlines, it is sufficient to preclude summary judgment. *See In re Mod. Dairy of Champaign*, 171 F.3d at 1109.

Though a reasonable person may infer from this evidence that GOJO had at least until the end of the 2022 calendar year to perform, one may also conclude that the extrinsic evidence supports a tighter deadline. Because extrinsic evidence does not lend itself to a single reasonable inference as to the omitted deadline, it cannot warrant summary judgment.

C.    **The Illinois UCC gap filler provision does not warrant summary judgment.**

---

[14] Courts have found that the COVID-19 pandemic renders parties' prior course of dealing irrelevant in some instances. *Allied Metal Co. v. Elkem Materials Inc.*, No. 21 C 1629, 2024 WL 4299018, at *8 (N.D. Ill. Sept. 26, 2024). Here, however, the impromptu extension of the 2020 Contract (from December 2020 through February 2021) also occurred during the pandemic. Further, there remains a dispute of fact as to whether and to what extent the pandemic interfered with GOJO's ability to estimate its need for the Product at the time of the Contract.

GOJO next argues that Illinois's UCC permitted it to still perform at the time of termination. Where a contract does not provide time for performance, Illinois's UCC fills the gap. *See Driveline Sys., LLC*, 936 F.3d at 580 (citing 810 Ill. Comp. Stat. 5/2-309); see also *Malnove Inc. of* Nebraska, 944 F. Supp. 657. It follows that the UCC is not implicated where the parties have agreed to the time for performance. A court may find such an agreement implied in "the contractual circumstances, usage of trade or course of dealing or performance as well as in an express term." 810 ILCS 5/2-309 at UCC Cmt. 1. However, vague promises of performance alone do not preclude application of the gap filler provision. *See Lawrence Crawford Ass'n for Exceptional Citizens, Inc. v. Conversource, Inc.*, 2012 IL App (5th) 110061-U, ¶ 16.

As discussed above, there is a dispute of fact as to whether the extrinsic evidence demonstrates that the parties agreed on a time for performance. If so, the existence of that implied agreement would preclude the application of the UCC. *See* 810 ILCS 5/2-309 at UCC Cmt. 1. Thus, although the UCC may apply, the extrinsic evidence would render that application premature at this stage. However, even if the Court were to apply the UCC, summary judgment would still be inappropriate. What constitutes a "reasonable amount of time" is a determination for the trier of fact. *See Fountain*, 2005 WL 8178951 at *5 (finding that what constitutes a "reasonable amount of time" under 5/2-309 is a factual determination that precludes summary judgment); *see also GNP Commodities, Inc. v. Walsh Heffernan Co.*, 95 Ill. App. 3d 966, 972, 420 N.E.2d 659, 664 (1981). Therefore, even if the Court were to find that the UCC provision applied, there would remain a factual dispute precluding summary judgment.[15]

---

[15] The UCC also imposes certain notification requirements on a party seeking to bring a breach of contract claim. Generally, the party must provide the breaching party prior notice. 810 ILCS 5/2-309(3); *see also Conversource, Inc.*, 2012 IL App (5th) 110061-U at ¶ 20. GOJO argues that BioUrja failed to provide it the requisite notice. D. 53 at 27–28. However, this argument is premature. As discussed, because a jury may determine that the extrinsic evidence does establish a deadline, the Court cannot conclude at this stage that the UCC and its notification requirement apply.

**D.**    ***Contra proferentum* does not warrant summary judgment.**

GOJO also argues that the Court should construe the Contract's ambiguity against BioUrja, because ADM (BioUrja's predecessor) drafted the provision at issue. The doctrine of *contra proferentum* states that any ambiguity in a contract should be construed against the drafting party. *Ancraft Prods. Co. v. Universal Oil Prods. Co.*, 100 Ill. App. 3d 694, 698, 427 N.E.2d 585, 588 (1981). The rule is classified as "a secondary rule of interpretation, a last resort which may be invoked after all the ordinary interpretive guides have been exhausted." *Premier Title Co. v. Donahue*, 328 Ill. App. 3d 161, 166, 765 N.E.2d 513 (2002).

In response, BioUrja argues that *contra proferentum* does not apply because ADM and GOJO both drafted the Contract's "Other" provision and contributed to the omitted deadline. In support of this contention, BioUrja notes that the "Other" provision was only included in response to GOJO's request. Alternatively, BioUrja argues that the doctrine is not yet applicable, given that the Court has not exhausted traditional contract interpretation tools. This latter argument is persuasive. As discussed, *contra proferentum* is a tool of last resort and where, such as here, a fact finder could ultimately resolve the ambiguity on extrinsic evidence – invocation of the doctrine "is, at best, premature." *See William Blair & Co.*, 358 Ill. App. 3d at 345, 830 N.E.2d at 778. But even if the extrinsic evidence does not imply a deadline, the UCC gap-filler provision would supplement this omitted term and remedy any ambiguity thus, not implicating this tool of last resort.

**E.**    **Absent a specific deadline, a dispute of fact persists as to whether BioUrja waived its right to enforce the contract.**

Finally, GOJO argues that summary judgment is warranted because BioUrja waived its rights to demand GOJO performance prior to termination.

      *1. Legal Standard*:

Waiver is the "*intentional* relinquishment of a known and existing right." *Dustman v. Advoc. Aurora Health, Inc.*, 2021 IL App (4th) 210157, ¶ 30, 192 N.E.3d 47 (emphasis in original). Thus, to find waiver, "the party must have had a subjective purpose to give up the right." *Id*.; *see also Rice v. Meneely*, 2023 IL App (5th) 220650-U ¶ 19 (noting that the waiver "analysis focuses on the intent of the nonbreaching party."). Generally, a waiver may be express or implied. Absent an express waiver, a court may find a party intentionally relinquished their rights where either "(1) an unexpressed intention to waive can be clearly inferred from the circumstances[,] or (2) the conduct of one party has misled the other party into a reasonable belief that a waiver has occurred." *Batterman v. Consumers Illinois Water Co.,* 261 Ill.App.3d 319, 321, 199 Ill.Dec. 881, 634 N.E.2d 1235 (1994).

A court may grant summary judgment on this affirmative defense only if material facts are undisputed and there is "only one reasonable inference" to be drawn from them. *Cent. Tower Exch. Corp. v. German Motor Parts GmbH*, 518 F. Supp. 3d 1233, 1241 (C.D. Ill. 2021). Conversely, "if material details are disputed or if more than one reasonable inference may be drawn from the agreed upon facts," summary judgment is not warranted. *Id*. As an affirmative defense, GOJO carries the burden of showing by clear and convincing evidence that BioUrja intended to waive its rights under the Contract. *See JSM Mgmt., Inc. v. Brickstreet Mut. Ins. Co.*, No. 18-CV-2154, 2020 WL 7634581 (C.D. Ill. Dec. 22, 2020).

2.  *Discussion*:

First, as set forth above, the Contract's unambiguous language clearly shows that GOJO's deadline to consume the Contact extended beyond February 2022. Therefore, the Court need not resolve the issue of whether BioUrja waived this deadline. Rather, the only waiver issue is whether

there is clear and convincing evidence that BioUrja waived its right to demand performance before October 13, 2022 – the date of the termination.

Relevant to this inquiry, is the Contract's "Miscellaneous" provision which states, in part: "Any waiver shall be ineffective unless it is in writing and signed by the party granting it." *See* D. 54-10 at 6. Thus, GOJO's arguments that BioUrja's failure to explicitly tell GOJO that it was required to perform by a certain date do not amount to waiver under the Contract.

GOJO's argument that BioUrja waived any right to demand performance before the end of the 2022 calendar year may sound familiar. It is only a slightly modified version of GOJO's earlier argument that the evidence demonstrates the parties agreed GOJO had the entire 2022 calendar year to perform. The Court found that a juror could reasonably infer that ADM/BioUrja did not have this intention given the absence of affirmative statements approving such deadline. Here, GOJO asks the Court to find that – even if BioUrja intended for the Contract to end within prior to 2023– it waived its right to enforce such a deadline, essentially agreeing to extending the Contract to the end of the 2022 calendar year.

GOJO's best argument would be under the concept of implied waiver. Certainly, BioUrja's conduct and failure to object to GOJO's 2023 estimates warrant an inference that it subjectively waived the right to enforce performance before 2023. But the Contract required any waiver to be in writing, signed by the party waiving. Thus, the following discussion is limited to the writings in the record.

In an attempt to satisfy this requirement, GOJO relies on much of the same extrinsic evidence previously discussed. First, GOJO points to the email it received from ADM on September 14, 2021, which states:

> [ADM:] I know the answer but wanted to check. I'm being asked to update how was have your contract broken out. Right now I have it scheduled/forecasted for

approx. 23 cars per month but with no August and September shipment I probably need to readjust. Based on what you see / hear do you think we are looking at this contract going through Q1 2023 at this point or still end by Dec. 2022? I just need to try my best to weight it to the best of my/our ability.

[GOJO:] I can call you tomorrow to offer some more insight but it is likely if we keep our entire current contracted volume we will be going into 2023.

D. 53-3 at 57.

GOJO argues that ADM's failure to reject GOJO's response constitutes waiver. *Id*. GOJO's attempt to find waiver in ADM's silence is unpersuasive. The Contract required any waiver be in writing. Though the above email constitutes a writing, GOJO confusingly asks the Court to look at the things ADM did *not* write. Even if the Contract allowed such an omitted writing to operate as a waiver, it does not warrant the sole inference that ADM intended to waive its rights in its non-response. Both parties agreed that any waiver would be in writing. Because ADM did not explicitly waive its rights in writing, one could reasonably infer that it did not intend to relinquish any rights under the Contract.

Finally, GOJO argues an internal communication within BioUrja demonstrates waiver. The email reads, in part,

[GOJO] recognize[s] they have a contract, they will pull, they said they should start pulling in 2023…. I am stringing them a long (*sic*) to keep them on the hook for their existing high priced contract. We do need to make sure it never goes in their favor. In other terms, this is not a free option where they can wait until their contract comes back into the money.

D. 53-6 at 9.

According to GOJO, this email shows that BioUrja was lulling GOJO into believing it could still perform under the Contract. In support of its argument, it cites to *Rice v. Meneely*, 2023 IL App (5th) 220650-U. *See* D. 31–32. In *Rice*, the court found clear and convincing evidence of waiver where the party "accepted the [breaching party's] payments,

acknowledged the COVID-19 crisis, acknowledged the issues that needed to be corrected in the agreed order, and offered to be patient." *Rice*, 2023 IL App (5th) 220650-U, at ¶ 8.

Though the *Rice* court found waiver clear, GOJO's argument here is a bit more strained. First, unlike *Rice*, the above email was internal and GOJO did not see these communications until this litigation commenced.[16] It is not reasonable then to conclude that these writings provided GOJO false assurance. Nor is it reasonable to conclude that BioUrja intended to waive its rights under the Contract with a writing that was not directed to the other contracting party.

Even if it did, the email did not contain any statements akin to those in *Rice* where the nonbreaching party offered to be patient and recognized the impediments created by the pandemic. Here, BioUrja reported that GOJO stated it planned to perform in 2023, but nowhere does it state that it would accept this performance. Nor did BioUrja ever have the opportunity to accept GOJO's performance as, unlike *Rice*, GOJO did not perform under the Contract after the Contract's Term provision.

Further complicating this discussion, is the remaining factual dispute as to when GOJO's performance was actually due. As discussed, a party can only waive "a known and existing right." *See Rice*, 2023 IL App (5th) 220650-U, at ¶ 19. At this stage of the litigation, the Court cannot determine when the parties' intended GOJO's performance due or if they even agreed on any deadline at all. This missing piece permits competing reasonable inferences as to the meaning of the above internal correspondence. For example, if the parties intended the Contract deadline be sometime in July 2022, BioUrja's "stringing

---

[16] For similar reasons, GOJO's attempt to establish waiver through BioUrja's decision to internally file the Contract as "significantly delayed" and not "defaulted" is not persuasive. See D. 53 at 19. GOJO does not allege that this writing was ever communicated to them prior to litigation. Thus, a reasonable person could infer that BioUrja did not intend to waive any of it rights through a writing that never reached the opposing party.

a long (*sic*)" comment could amount to waiver. In contrast, if the jury were to find that they intended a deadline after August 2022 and before October 13, 2022, it could infer that BioUrja was "stringing it along (*sic*)" until it could hold GOJO  in breach of the Contract. In sum, what BioUrja was "stringing"  GOJO towards – a projected 2023 deadline or a breach of contract claim – is for the jury to decide.[17] Absent another writing indicating that BioUrja was waiving its right to a performance prior to 2023, the Court cannot grant summary judgment on the basis of waiver.

## IV.     CONCLUSION

For the reasons stated above, Defendant GOJO Industries, Inc's [53] Motion for Summary Judgment is DENIED. The Court will address Plaintiff BioUrja Renewable, LLC's pending [54] Motion for Partial Summary Judgment on GOJO's Affirmative Defenses in a subsequent order.

Entered on February 5, 2026.

s/ Michael M. Mihm
Michael M. Mihm
United States District Judge

---

[17] Moreover, at the time of the August 2022 email, both parties were seemingly stringing the other along. Prior to termination, GOJO had not placed a purchase order under the Contract for ten months. It was ordering the same product from another supplier of ethanol, who it found more litigious than BioUrja. GOJO also does not dispute rumors that it "was scheming to get rid of BioUrja" and that it "want[ed] out of the Agreement." D. 64 at 13.